Slip Op. 22-157

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YAMA RIBBONS AND BOWS CO., LTD., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Timothy C. Stanceu, Judge |
| Defendant, | Court No. 20-00059 |
| and | |
| BERWICK OFFRAY LLC, | |
| Defendant-Intervenor. | |

### OPINION AND ORDER

[Ordering remand of an agency determination in a countervailing duty proceeding on narrow woven ribbons with woven selvedge from the People's Republic of China.]

Dated: December 23, 2022

*Lizbeth R. Levinson*, Fox Rothschild LLP, of Washington, D.C., for plaintiff Yama Ribbons and Bows Co., Ltd. With her on the briefs were *Brittney R. Powell* and *Ronald M. Wisla*.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for defendant the United States of America. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief is *Rachel A. Bogdan*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Daniel B. Pickard*, Buchanan Ingersoll and Rooney PC, of Washington D.C., for defendant-intervenor Berwick Offray LLC.

Stanceu, Judge:  Plaintiff Yama Ribbons and Bows Co., Ltd. ("Yama") contests an administrative determination that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude a periodic administrative review of a countervailing duty ("CVD") order on certain ribbons from the People's Republic of China ("China" or the "PRC").  Concluding that the agency determination is contrary to law in one respect, the court remands it to Commerce for appropriate corrective action.

## I. Background

### A.  The Contested Determination

The contested determination (the "Final Results") was published as *Narrow Woven Ribbons with Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 10,653 (Int'l Trade Admin. Feb. 25, 2020) ("*Final Results*").

### B.  Proceedings Before Commerce

On September 1, 2010, Commerce issued a countervailing duty order (the "Order") on narrow woven ribbons with woven selvedge from China (the "subject merchandise").  *Narrow Woven Ribbons With Woven Selvedge From the People's*

*Republic of China: Countervailing Duty Order*, 75 Fed. Reg. 53,642 (Int'l Trade Admin.)

("*Order*").[1]

On September 11, 2018, Commerce invited requests for a review of the Order for

the period of January 1, 2017, through December 31, 2017 (the "period of review" or

"POR").  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation;*

*Opportunity To Request Administrative Review*, 83 Fed. Reg. 45,888 (Int'l Trade Admin.).

Upon the request of Berwick Offray LLC ("Berwick Offray"), a U.S. ribbon producer

that was the petitioner in the countervailing duty investigation culminating in the

Order and the defendant-intervenor in this litigation, Commerce published a notice of

initiation of the administrative review, which was the seventh periodic review of the

Order.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*,

83 Fed. Reg. 57,411 (Int'l Trade Admin. Nov. 15, 2018).  Commerce identified Yama as

the sole exporter or producer of the subject merchandise in the seventh review.  *Id.*

at 57,418.

---

[1] The subject merchandise is defined generally in the countervailing duty order as woven ribbons twelve centimeters or less in width, and of any length, that are composed in whole or in part of man-made fibers and that have woven selvedge.  Some exclusions apply.  *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Countervailing Duty Order*, 75 Fed. Reg. 53,642, 53,642–43 (Int'l Trade Admin. Sept. 1, 2010).  The term "selvedge" refers to "the edge on either side of a woven or flat-knitted fabric so finished as to prevent raveling."  *Selvage or selvedge*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002).

On August 23, 2019, Commerce published the preliminary results of the review

("Preliminary Results"), assigning Yama a total net CVD subsidy rate of 31.57%.

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China:*

*Preliminary Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg.

44,281, 44,282 (Int'l Trade Admin.) ("*Preliminary Results*").  Commerce also published an

explanatory document for the preliminary results.  *Decision Memorandum for Preliminary*

*Results of 2017 Countervailing Duty Administrative Review: Narrow Woven Ribbons with*

*Woven Selvedge from the People's Republic of China* (Int'l Trade Admin. Aug. 5, 2019), P.R.

Doc. 110 ("*Prelim. Decision Mem.*").[2]

Commerce published the Final Results on February 25, 2020.  *Final Results*,

85 Fed. Reg at 10,654.  Commerce incorporated by reference an explanatory

memorandum, the final decision memorandum.  *Issues and Decision Memorandum for the*

*Final Results of 2017 Countervailing Duty Administrative Review: Narrow Woven Ribbons*

*with Woven Selvedge from the People's Republic of China* (Int'l Trade Admin. Feb. 19, 2020),

P.R. Doc. 171 ("*Final I&D Mem.*").  Commerce determined that Yama benefited from

twenty-three subsidy programs and assigned Yama a total net countervailable subsidies

rate of 31.87%, *Final Results*, 85 Fed. Reg at 10,654, marginally higher than the rate of

---

[2] Documents in the Joint Appendix (Mar. 26, 2021), ECF Nos. 38 (conf.), 39 (public) are cited herein as "P.R. Doc. __."  All citations to record documents are to the public versions of those documents.

31.57% Commerce calculated in the Preliminary Results, *Preliminary Results*, 84 Fed.

Reg. at 44,282.

Here, Yama contests the Department's inclusion of the following three subsidies

in the 31.87% total subsidy rate: a rate of 10.54% for the Export Buyer's Credit Program

("EBC Program" or "EBCP"), which is an export-promoting loan program administered

by the Export Import Bank of China; a rate of 17.76% for the provision of synthetic yarn

for less than adequate remuneration ("LTAR"); and a rate of 0.17% for the provision of

caustic soda for LTAR.

### C.  Proceedings in the Court of International Trade

Yama brought the instant action in March 2020.  Summons (Mar. 9, 2020),

ECF No. 1; Compl. (Mar. 25, 2020), ECF No. 7.  Before the court is Yama's motion for

judgment on the agency record under USCIT Rule 56.2 and accompanying brief.  Mot.

for J. on the Agency R. (Oct. 28, 2020), ECF No. 29; Mem. of P. & A. in Supp. of Pl.'s 56.2

Mot. for J. on the Agency R. (Oct. 28, 2020), ECF No. 29-2 ("Pl.'s Br.").

The United States and defendant-intervenor Berwick Offray oppose Yama's

motion, urging the court to sustain the Final Results.  Def.'s Resp. in Opp'n to Pl.'s Mot.

for J. upon the Agency R. (Jan. 26, 2021), ECF No. 34 ("Def.'s Br."); Resp. Br. of Def.-Int.

Berwick Offray LLC in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Jan. 26,

2021), ECF No. 33.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction over this action according to section 201 of the

Customs Courts Act of 1980, 28 U.S.C. § 1581(c), which grants this Court authority to

review actions commenced under section 516A of the Tariff Act of 1930, *as amended* (the

"Tariff Act"), 19 U.S.C. § 1516a, including actions contesting a final determination that

Commerce issues to conclude an administrative review of a countervailing duty order.

*Id*. § 1516a(a)(2)(B)(iii).[3]

In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  *Id*. § 1516a(b)(1).

Substantial evidence refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d

1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B.  Countervailing Duties under the Tariff Act

When certain conditions are met, the Tariff Act provides for a "countervailing

duty" to be imposed on imported merchandise to redress the effect of a subsidy

---

[3] All citations to the United States Code herein are to the 2018 edition.  Citations
to the Code of Federal Regulations are to the 2019 edition.

provided by the government of the exporting country.  Section 701(a) of the Tariff Act,

19 U.S.C. § 1671(a), directs generally that Commerce is to impose a countervailing duty

if: (1) Commerce determines that an "authority," defined as either the government of a

country or any public entity within the territory of the country, *id*. § 1677(5)(B), "is

providing, directly or indirectly, a countervailable subsidy with respect to the

manufacture, production, or export of a class or kind of merchandise imported, or sold

(or likely to be sold) for importation, into the United States"; and (2) the U.S.

International Trade Commission determines that an industry in the United States is

materially injured or threatened with material injury by reason of the subsidized

imports.

A "countervailable subsidy" exists, generally, where an authority provides a

financial contribution to a person and a benefit is thereby conferred, and the subsidy

meets the requirement of "specificity," as determined according to various rules set

forth in the statute.  *Id.* §§ 1677(5), (5A).  When subsidies consist of the provision of

goods or services rather than the provision of monies directly, a benefit is conferred if

those goods or services are provided for less than adequate renumeration.  *Id.*

§ 1677(5)(E)(iv).

C.  **Use of Facts Otherwise Available and Adverse Inferences when the Exporting Country Government Fails to Cooperate in a CVD Proceeding**

In the Final Results, Commerce invoked its authority to use "the facts otherwise available" under section 776(a) of the Tariff Act, 19 U.S.C. § 1677e(a), and "adverse inferences" under section 776(b) of the Tariff Act, 19 U.S.C. § 1677e(b), with respect to the EBCP and the provision of synthetic yarn and caustic soda.  When using both the "facts otherwise available" and the "adverse inference" provisions, Commerce describes its action by using the term "adverse facts available" ("AFA").

Commerce may resort to the use of facts otherwise available when, for example, "an interested party or any other person" withholds requested information or "significantly impedes a proceeding."  *See* 19 U.S.C. § 1677e(a)(2).  If Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply" with a request for information, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  *Id*. § 1677e(b)(1)(A).

Upon conducting a countervailing duty investigation or review, Commerce, in some circumstances, may use an inference adverse to the interests of a party in a countervailing duty proceeding in the event of non-cooperation by the government of the exporting country in responding to the Department's requests for information, even if the result is a collateral adverse effect upon a fully cooperative party.  *See Fine*

*Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014); *see also*

*Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316,

1325 (2018) (quoting *Archer Daniels Midland Co. v. United States*, 37 CIT 760, 768–69, 917

F. Supp. 2d 1331, 1342 (2013)) ("Commerce may apply AFA even if the collateral effect

is to 'adversely impact a cooperating party.'").  But in such an event, Commerce should

"seek to avoid such impact if relevant information exists elsewhere on the record."

*Changzhou Trina Solar Energy Co.*, 42 CIT at __, 352 F. Supp. 3d at 1325 (citation omitted).

        In the seventh review, Yama was not found to have withheld any information or

to have failed to cooperate in responding to the Department's information requests.

Commerce based its use of the facts otherwise available and adverse inferences entirely

on its findings of non-responsiveness and non-cooperation on the part of the

government of China (the "GOC").  Instead of acting to the best of its ability to respond

to the Department's information requests in the seventh review, the GOC put forth only

a minimal effort.  Its only response to the Department's inquiries during the review

consisted of a one-page cover letter submitted by Yama's counsel "on behalf of the

China Chamber of International Commerce ('CCOIC')," accompanied by what the cover

letter described as "a copy of the response of the Government of China and its legal

brief from the AR ["Administrative Review"] 01/01/2016-12/31/2016 segment of the

proceeding (GOC's AR 2016 Response)."  *Narrow Woven Ribbons with Woven Selvedge*

*from the People's Republic of China: GOC Response* 1 (Feb. 19, 2019), P.R. Docs. 21, 23

("*GOC's Questionnaire Resp.*").  The cover letter stated, "CCOIC submits that, because of

the overlapping programs between the two segments of the proceeding, the

Department should accept the GOC's AR2016 response as GOC's response to the

Department's Nov. 26, 2018 questionnaire issued to the GOC."  *Id*.  The letter then

stated that "CCOIC also wishes to inform the Department that it will not submit any

further responses for the GOC in this proceeding."  *Id*.  The Department's initial

questionnaire to the GOC included requests for information pertaining specifically to

the POR for the seventh review, i.e., to calendar year 2017.  *See 2017 Administrative*

*Review of the Countervailing Duty Order on Narrow Woven Ribbons with Woven Selvedge*

*from the People's Republic of China: Countervailing Duty Questionnaire* ( Nov. 26, 2018), P.R.

Doc. 4 ("*GOC's Initial Questionnaire*").  The Chinese government made no attempt to

respond to these time-specific requests.

### D.  The Export Buyer's Credit Program

The Export Buyer's Credit Program is an export-promoting loan program

administered by the Export Import Bank of China (the "EX-IM Bank").  *See Final I&D*

*Mem*. at 11–13.  In reaching its decision to impose countervailing duties based on the

EBCP, Commerce invoked its "facts otherwise available" and "adverse inference"

authorities, under 19 U.S.C. § 1677e(a) and (b), respectively, to rule that the Export

Buyer's Credit Program "provides a financial contribution, is specific, and provides a

benefit to Yama within the meaning of sections 771(5)(D) [19 U.S.C. § 1677(5)(D),

'Financial contribution'], 771(5A) [19 U.S.C. § 1677(5A), 'Specificity'], and 771(5)(E)

[19 U.S.C. § 1677(5)(E), 'Benefit conferred'] of the [Tariff] Act."  *Id.* at 26.

     Yama argues that Commerce should not have imposed countervailing duties

upon Yama's exports for the EBCP, arguing that Yama received no benefit from that

program and that Commerce impermissibly concluded to the contrary in relying upon

19 U.S.C. § 1677e(a) and (b).  Yama claims that record evidence, disregarded by

Commerce, demonstrates that neither Yama nor its customers used this program and,

therefore, that the imposition of a subsidy rate for the EBCP was unlawful.  Pl.'s Br. 12–

16.  In the alternative, Yama claims that the 10.54% subsidy rate Commerce imposed on

Yama and attributed to the program was "extremely adverse, punitive and not related

to exports or this industry, or connected to the EBC."  *Id.* at 24–25.

### 1.  The Use of Adverse Inferences for the EBC Program

     In support of its principal claim, Yama argues, first, that "the GOC fully

answered Commerce's questions regarding usage of the EBC Program" and argues,

second, that Yama "also submitted complete responses pertaining to the EBC Program."

Pl.'s Br. 11.  The court agrees with Yama's second argument, but not the first.

In its initial questionnaire, Commerce asked Yama, with respect to the Export Buyer's Credit Program, to "discuss in detail the role your company plays in assisting your customers in obtaining buyer credits." *Narrow Woven Ribbons With Woven Selvedge from People's Republic of China, Antidumping Duty: Response to Section III Questionnaire* 17 (Feb. 5, 2019), P.R. Doc. 12. Yama responded that it "did not provide any assistance to its customers in obtaining buyer credits." *Id*. Commerce also requested as follows: "If you claim that none of your customers used buyer credits during the POR, please explain in detail the steps you took to determine that no customer used the Buyer Credit Facility." *Id*. at 17–18. Yama responded that it "contacted all of its US customers, as listed in Exhibit 12, and confirmed that no customer obtained buyers' credit from China Ex-Im Bank in the POR" and that "[m]oreover, some of Yama Ribbons' US customers signed back certifications that they did not use buyer credit from EXIM Bank during the POR." *Id*. at 18. Yama included these certifications and requests for certifications to its response. *See id*. at Ex. 13.

The Department's initial questionnaire to the Chinese government sought certain information on EBCP usage that was specific to the POR, i.e., calendar year 2017. *GOC's Initial Questionnaire* at 1, II-12–II-13. For example, Commerce asked the GOC to "answer the below listed questions regarding Export Buyer's Credits provided to **all** U.S. customers of the mandatory company respondents . . . during the POR." *Id*. at II-12.

Seven information requests followed.  Of particular significance was the seventh

request in the initial questionnaire pertaining to the EBCP, which was as follows:

"If you claim that no customer of the respondent companies used buyer credits, please

explain in detail the steps the government took to determine that no customer used

Export Buyer's Credits.  In your answer, please identify the documents, databases,

accounts etc. that were examined to determine there was no use." *Id.* at II-13.  The

GOC's questionnaire response from the prior review included a detailed response to

this question. *GOC's Questionnaire Resp.*, Ex. B at 66.  That response began with the

statement that "[t]he GOC contacted the mandatory Respondent Company YAMA to

ask for its customer lists.  YAMA provided its customer lists to the GOC, and the GOC

confirmed no company on that list obtained any Export Buyers Credits from the EX-IM

Bank during the POR." *Id.*  This statement would have provided responsive, and

probative, information had it pertained to measures the Chinese government undertook

during calendar year 2017.  But neither the GOC nor Yama submitted record evidence

demonstrating that it did.

    Commerce must be afforded discretion to determine the scope of its inquiry in

conducting reviews of countervailing duty orders, so long as it does so reasonably.

Here, it was reasonable for Commerce to request information from the Chinese

government to supplement and corroborate the information Yama provided to show

that neither Yama nor its U.S. customers used the EBCP.  But because the Chinese

government made no effort to provide the requested information as it related

specifically to the period of review, Commerce was within its authority in using an

adverse inference that Yama benefitted from the EBCP during that period.

Yama argues that Commerce conducted an on-site verification and reported

having found no evidence that Yama used subsidies other than the ones Yama reported

to have used.  Pl.'s Br. 16–17.  According to Yama, "Commerce did not discover any

evidence during verification that contradicted Yama Ribbons' claims of non-use, and in

the absence of any other controverting evidence, Commerce's finding that Yama

Ribbons used and benefitted from the EBC Program was not supported by substantial

evidence and was otherwise unlawful."  *Id*. at 17.  The gist of Yama's argument is that

the information Yama submitted, when combined with the report of the verification and

the GOC's responses from the prior review, constituted substantial evidence that Yama

did not benefit from the EBCP during calendar year 2017.  But that argument overlooks

the Department's valid finding that the POR-specific information it requested from the

GOC was missing from the record due to the failure of the Chinese government to make

even a minimal effort to assist Commerce in confirming that Yama received no benefit

from the EBCP during that year.  While "relevant information" existed "elsewhere on

the record," *Changzhou Trina Solar Energy Co.*, 42 CIT at __, 352 F. Supp. 3d at 1325

(citation omitted), obtained from Yama and its suppliers, that would lend support to a

finding that Yama did not benefit from the EBCP, Commerce was not required to

consider that information determinative in the particular situation this case presents.  It

was reasonable in that situation for Commerce to consider the POR-specific information

it sought from the GOC—none of which it obtained—to be essential to its inquiry.

Yama also argues that "[a]s explained by the GOC in its response to Section II of

the questionnaire, under the EBC Program the loan applicant must provide credit

materials and supporting documents to the exporter."  Pl.'s Br. 17.  This argument fails

to persuade the court because the questionnaire response on which Yama relies did not

provide requested information pertaining to the EBCP as administered by the EX-IM

Bank during the POR for the seventh review and was not prepared for that purpose.

Yama's argument presumes that Commerce was required to infer that the information

in the GOC's responses for the previous review remained valid for the current review.

The information on the record of the seventh review was insufficient to compel

Commerce to draw such an inference.  The vague statement in the cover letter that

Commerce should accept the questionnaire response in the sixth review as the

questionnaire response for the seventh review "because of the overlapping programs

between the two segments of the proceeding" does not demonstrate that all information

in that response remained valid for the 2017 calendar year.  *GOC's Questionnaire Resp.*

at 1.

### 2.  The Department's Choice of a Subsidy Rate for the EBCP as an Adverse Inference

The court concludes that a remand to Commerce is required in this case in

response to Yama's alternate claim that the 10.54% subsidy rate Commerce imposed on

Yama was "extremely adverse, punitive and not related to exports or this industry, or

connected to the EBC Program."  Pl.'s Br. 24.  Yama argues, *inter alia*, that the

countervailing duty rate Commerce chose as an adverse inference was not permissible

because it pertained to a program in China that the Chinese woven ribbons industry

could not use.  *Id*.  This argument merits consideration because of the way Commerce

described its methodology for choosing a countervailing duty rate as an adverse

inference:

> Consistent with section 776(d) of the Act [19 U.S.C. §1677e(d)] and
> our established practice, we select the highest calculated rate for the same
> or similar program as AFA.  When selecting rates in an administrative
> review, we first determine if there is an identical program from any
> segment of the proceeding and use the highest calculated rate for the
> identical program (excluding *de minimis* rates).  If no such identical
> program exists, we then determine if there is a similar/comparable
> program (based on the treatment of the benefit) within the same
> proceeding and apply the highest calculated rate for the
> similar/comparable program, excluding *de minimis* rates.  When there is no
> comparable program, we apply the highest calculated rate from any non-
> company specific program in any CVD case involving the same country,
> *but we do not use a rate from a program if the industry in the proceeding cannot
> use that program*.

*Prelim. Decision Mem.* at 10 (emphasis added) (footnotes omitted).  It appears that Commerce used the last method mentioned in this excerpt from the Preliminary Decision Memorandum ("the highest calculated rate from any non-company specific program in any CVD case involving the same country").  Commerce stated that "consistent with *Ribbons AR 2016* [the previous review of the Order, for which the period of review was calendar year 2016], we assigned an AFA rate of 10.54 percent *ad valorem*, the highest rate determined for a similar program in *Coated Paper from China*, as the rate for this program."  *Id*. at 11 (footnotes omitted).

The Department's reference to "*Coated Paper from China*" was a reference to *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 70,201 (Int'l Trade Admin. Nov. 17, 2010). *Id*. at 11 n.41.  The Preliminary Decision Memorandum describes the 10.54% CVD subsidy rate as the "revised rate for 'Preferential Lending to the Coated Paper Industry.'"  *Id*.  The Preliminary Decision Memorandum does not explain how this program was considered to be available to the woven ribbons industry in China and thereby conformed to the Department's own stated method of choosing a rate as an adverse inference.

In support of the Department's choice of a rate Commerce determined in a another proceeding from a program entitled "Preferential Lending to the Coated Paper Industry," defendant argues that "Commerce found that based on the record of *Coated Paper from China*, there is no evidence to support Yama's argument that preferential lending in China is only provided to the coated paper industry." Def.'s Br. 32. This argument misinterprets the "substantial evidence" prong of the standard of review the court must apply. The pertinent issue is not whether substantial evidence existed (in this or another proceeding) "to support Yama's argument" but whether substantial evidence existed on the record of *this* proceeding to support the Department's findings in the determination contested before the court. Commerce proceeded under an assumption that the industry of which Yama is a part could have used a program designated as benefitting the Chinese coated paper industry, but defendant has not pointed to substantial evidence on the record of the seventh review that could have supported this assumption.

On remand, Commerce must reconsider, in the entirety, its use of the 10.54% rate as an adverse inference and explain why whatever rate it decides to use is appropriate under 19 U.S.C. § 1677e(b) and is consistent with the purpose of that statute, which, rather than to impose a rate that is "punitive," is to encourage interested parties to act to the best of their ability to comply with the agency's information requests. Commerce

must explain, specifically, why it considers the rate it chooses to be appropriate for that

purpose in the special case presented here, in which an unreasonably high rate could

unduly prejudice Yama, as the "interested party" that was fully cooperative during the

review.

### E. Provision of Synthetic Yarn and Caustic Soda for Less-Than-Adequate Remuneration

A countervailable subsidy potentially may exist where an "authority," which the

Tariff Act defines as a "government of a country or any public entity within the

territory of the country," 19 U.S.C. § 1677(5)(B), confers a benefit upon a person by

providing goods "for less than adequate remuneration," *id*. § 1677(5)(E)(iv).  In order to

be countervailable, any such subsidy also must satisfy the "specificity" requirement set

forth in the statute.  *Id*. §§ 1677(5)(A), (5A).  In the seventh review, Commerce

designated each of Yama's suppliers of synthetic yarn and caustic soda as "authorities,"

invoking its authority to use facts otherwise available, *id*. § 1677e(a), and adverse

inferences, *id*. § 1677e(b).  Commerce invoked its facts otherwise available authority

based on its finding that the GOC "withheld necessary information that was requested

of it."  *Final I&D Mem.* at 10.  Commerce resorted to adverse inferences upon finding

that the Chinese government "failed to cooperate by not acting to the best of its ability

to comply with our requests for information."  *Id*.  Commerce stated, further, that "[i]n

drawing an adverse inference, we continue to find that prices from actual transactions

involving Chinese buyers and sellers are significantly distorted by the involvement of

the GOC," *id.* (footnote omitted), and that "we continue to find that the use of an

external benchmark is warranted for calculating the benefit for the provision of

synthetic yarn and caustic soda for LTAR," *id.*  Using import prices as a determinant of

"world market prices available to purchasers in China," *id.* at 12, as its benchmarks for

the two inputs in determining what would have been adequate remuneration for the

two inputs, Commerce, applying the method prescribed by its regulations, 19 C.F.R.

§ 351.511(a)(2)(ii), calculated a subsidy rate of 17.76% for the provision of synthetic yarn

and a subsidy rate of 0.17% for the provision of caustic soda.

Yama brings only one claim with respect to the Department's including subsidy

rates for synthetic yarn and caustic soda in the total net countervailable subsidies rate of

31.87%: "In short, this Court should reverse Commerce's decision to apply adverse facts

available by finding that each of the private companies which supplied Yama with

synthetic yarn and caustic soda is an 'authority.'"  Pl.'s Br. 9.  The court does not find

merit in this claim.

In the initial questionnaire to GOC, Commerce requested, for the period of the

current review (calendar year 2017), that the GOC disclose whether a Chinese

Communist Party ("CCP") committee, branch or "primary organization" was formed

within the supplier companies and whether government or CCP officials were involved

as owners, directors, or managers of any of Yama's suppliers of the two inputs in

question during the POR.  *See Final I&D Mem*. at 11; *GOC Initial Questionnaire* at II-26–

II-27 ("Please identify any individual owners, members of the board of directors, or

senior managers who were Government or CCP underlineofficials during the PO[R]").  As

discussed previously in this Opinion and Order, the CCOIC did not respond to that

questionnaire and informed Commerce that it would not submit any further responses

for the GOC in this proceeding.  Providing the responses to a questionnaire for the

previous (sixth) review in no way cured this defect: those responses pertained to a

period of review of calendar year 2016.[4]  In light of the failure of the GOC to lend any

meaningful cooperation in responding to the Department's inquiries regarding a CCP

presence, Commerce lawfully drew an adverse inference that the operations of Yama's

suppliers of synthetic yarn and caustic soda were "authorities" for purposes of

19 U.S.C. § 1677(5)(B).  Yama's arguments to the contrary are not convincing.

    Yama argues that "Commerce does not identify in the Final Results what

information was missing from the administrative record," Pl.'s Br. 6, "or identify why

the GOC's response was inadequate," *id*. at 7.  The court disagrees.  Most important

---

[4] In a prior decision, this Court held that the Chinese government's response to
the initial questionnaire for the sixth review failed to provide information in response to
the Department's inquiries concerning CCP participation in the ownership or
operations of the suppliers.  *Yama Ribbons and Bows Co., Ltd. v United States*, 46 CIT __,
Slip Op. 22-138 (Dec. 8, 2022).

among the information Commerce sought but did receive was information on the

presence of government or CPP officials in leadership position of Yama's suppliers

during the POR for the seventh review.  Had Commerce received that information, it

could have requested additional information in an effort to ascertain the possible effect

during the POR of that presence in the commercial operations of any specific supplier, if

it existed.  Here, the Department's legitimate inquiry was thwarted by the GOC's failure

to make any meaningful response.  Nor can it credibly be said that Commerce failed to

identify why the GOC's response was inadequate.  With respect to responses to

questions specific to the POR for the seventh review, the Chinese government made,

essentially, no response at all.

        Yama points to the GOC's statements that "there were no programs for the

provision of either synthetic yarn or caustic soda" and "that all Yama's suppliers were

private companies with no affiliation to the GOC" and, from this information, argues

that "the initial questionnaire therefore ended the inquiry with regard to the programs

at issue."  *Id*.  Without having received the requested information on the possible CCP

influence on the specific suppliers, for the specific time period (calendar year 2017),

Commerce was within its discretion in using an adverse inference that these suppliers

were "authorities" in conducting the seventh review.  In determinations Yama does not

contest, Commerce concluded that Yama was able to obtain the two inputs from the

suppliers for less than the world market price that was available to it in China.

Commerce acted lawfully in deciding that the record before it, based on actual evidence

and permissible adverse inferences, allowed Yama to benefit from "programs" allowing

it to obtain the inputs for LTAR. *See Yama Ribbons and Bows Co., Ltd. v United States*,

46 CIT __, Slip Op. 22-138 (Dec. 8, 2022).

### III.  CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands the Final Results

to Commerce for reconsideration of the Department's decision to use, as an adverse

inference, a subsidy rate of 10.54% *ad valorem* for the Export Buyer's Credit Program.

Therefore, upon consideration of all papers and proceedings had herein, and

upon due deliberation, it is hereby

**ORDERED** that plaintiff's Motion for Judgment on the Agency Record (Oct. 28,

2020), ECF No. 29, be, and hereby is, granted in part and denied in part; it is further

**ORDERED** that Commerce shall submit a new determination upon remand

("Remand Redetermination") in compliance this Opinion and Order; it is further

**ORDERED** that Commerce will submit its Remand Redetermination within

60 days of the date of this Opinion and Order; it is further

**ORDERED** that any comments by plaintiff Yama Ribbons and Bows Co. and

defendant-intervenor Berwick Offray LLC in opposition to the Remand

Redetermination must be filed with the court no later than 30 days after the filing of

the Remand Redetermination; and it is further

**Court No. 20-00059**                                                    **Page 24**

     **ORDERED** that defendant and other parties supporting the Remand Redetermination may file comments in support of the Remand Redetermination within 30 days after the filing of the last comment in opposition to the Remand Redetermination.

                                                      /s/ Timothy C. Stanceu

                                                      Timothy C. Stanceu, Judge

Dated: December 23, 2022
      New York, New York