Slip Op. 24-43

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YAMA RIBBONS AND BOWS CO., LTD., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Timothy C. Stanceu, Judge |
| Defendant, | Court No. 20-00059 |
| and | |
| BERWICK OFFRAY LLC, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Remanding a redetermination in a countervailing duty proceeding on narrow woven ribbons with woven selvedge from the People's Republic of China]

Dated: April 10, 2024

*Brittney R. Powell*, Fox Rothschild LLP, of Washington, D.C., for plaintiff Yama Ribbons and Bows Co., Ltd. With her on the briefs were *Lizbeth R. Levinson* and *Ronald M. Wisla*.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General and *Patricia M. McCarthy*, Director. Of counsel on the brief was *Rachel A. Bogdan*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Daniel B. Pickard*, Buchanan Ingersoll and Rooney PC, of Washington D.C., for defendant-intervenor Berwick Offray LLC.

Stanceu, Judge: Plaintiff Yama Ribbons and Bows, Co., Ltd. ("Yama") contested a determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in a countervailing duty ("CVD") proceeding. The contested decision concluded the seventh periodic administrative review ("seventh review") of a countervailing duty order on narrow woven ribbons with woven selvedge from the People's Republic of China ("China" or the "PRC").

Before the court is the Department's "Remand Redetermination," issued in response to the court's opinion and order in *Yama Ribbons and Bows Co. v. United States*, 46 CIT __, 611 F. Supp. 3d 1394 (2022) ("*Yama I*"). *Final Results of Redetermination Pursuant to Court Remand* (Int'l Trade Admin. Feb. 15, 2023), ECF No. 48 ("*Remand Redetermination*"). Yama opposes the Remand Redetermination. Because a finding in the Remand Redetermination is not supported by evidence on the administrative record of the seventh review, the court remands this decision to Commerce for reconsideration and corrective action, as appropriate.

## I. BACKGROUND

Background for this case is presented in the court's prior opinion and is supplemented herein. *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1396—98.

## A.  The Contested Determination

Commerce published the determination contested in this litigation (the "Final Results") as *Narrow Woven Ribbons with Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017* 85 Fed. Reg. 10,653 (Int'l Trade Admin. Feb. 25, 2020), ("*Final Results*").  Commerce incorporated by reference an explanatory document, the "Final Issues and Decision Memorandum." *Issues and Decision Memorandum for the Final Results of 2017 Countervailing Duty Administrative Review: Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China* (Int'l Trade Admin. Feb. 19, 2020), P.R. Doc. 171 ("*Final I&D Mem.*").[1] The seventh review of the countervailing duty order pertained to entries made during a period of review ("POR") of January 1, 2017 through December 31, 2017.[2]

---

[1] Documents in the Joint Appendix (Mar. 26, 2021), ECF Nos. 38 (conf.), 39 (public) are cited herein as "P.R. Doc. __."  All citations to record documents are to the public versions.

[2] The countervailing duty order was issued in 2010.  *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Countervailing Duty Order*, 75 Fed. Reg. 53,642 (Int'l Trade Admin. Sept. 1, 2010).  Subject merchandise is defined generally in the countervailing duty order as woven ribbons twelve centimeters or less in width, and of any length, that are composed in whole or in part of man-made fibers and that have woven selvedge; some exclusions apply.  *Id*. at 53,642–43.  The term "selvedge" refers to "the edge on either side of a woven or flat-knitted fabric so finished as to prevent raveling."  *Selvage or selvedge*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002).

In the Final Results, Commerce determined that Yama benefitted from 23 countervailable Chinese government programs and assigned Yama a total countervailable subsidy rate of 31.87%. *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1397; *Final I&D Mem*. at 3–5.

### B. Yama's Claims in this Litigation

In a motion for judgment on the agency record brought under USCIT Rule 56.2, Yama challenged the Department's decisions to countervail three of the 23 programs and the associated countervailing duty subsidy rates: "a rate of 10.54% for the Export Buyer's Credit Program ("EBCP" or "EBC Program"), which is an export-promoting loan program administered by the Export Import Bank of China; a rate of 17.76% for the provision of synthetic yarn for less than adequate remuneration ("LTAR"); and a rate of 0.17% for the provision of caustic soda for LTAR." *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1398. For the derivation of all three of those subsidy rates, Commerce invoked its authority to use "facts otherwise available" under section 776(a) of the Tariff Act of 1930, *as amended* ("Tariff Act"), 19 U.S.C. § 1677e(a), and "adverse inferences" under section 776(b) of the Tariff Act, 19 U.S.C. § 1677e(b).[3] When relying on both the "facts otherwise available" and "adverse inference" provisions of the statute, Commerce uses the term "adverse facts available" or "AFA." *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1399; *Final I&D Mem*. at 2.

---

[3] Citations to the United States Code are to the 2018 edition.

In the Final Results, Commerce based its use of facts otherwise available on findings that the government of the PRC withheld requested information; it found, further, that adverse inferences were warranted because the Chinese government failed to cooperate by not acting to the best of its ability to comply with the Department's information requests. *Yama I*, 46 CIT at \_\_, 611 F. Supp. 3d at 1399—1400, 1404. Commerce did not find that Yama itself withheld any information or failed to cooperate to the best of its ability in responding to the Department's questionnaires.

### C. The Court's Opinion in *Yama I*

In response to Yama's Rule 56.2 motion, the court remanded the Final Results to Commerce with directions to reconsider the 10.54% rate applied as an adverse inference for the Export Buyer's Credit Program. *Yama I*, 46 CIT at \_\_, 611 F. Supp. 3d at 1405. The court denied relief on Yama's Rule 56.2 motion in all other respects.

### D. The Remand Redetermination and Comment Submissions

In response to *Yama I*, Commerce reconsidered the 10.54% rate it assigned for the EBCP. Commerce again assigned this rate in the Remand Redetermination and included an explanation of its revised reasoning. Yama opposed the Remand Redetermination in a comment submission to the court. Pl.'s Comments in Opposition to the Results of the Remand Redetermination (Mar. 17, 2023), ECF No. 50 ("Yama's Comments"). Defendant-intervenor did not comment. Defendant replied to Yama's opposition, advocating that the court sustain the Remand Redetermination. Def.'s

Response to Comments on Remand Redetermination (Apr. 1, 2023), ECF No. 51 ("Def.'s Resp.").

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), which grants this Court authority to review actions commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including actions contesting a final determination that Commerce issues to conclude an administrative review of a countervailing duty order. *Id*. § 1516a(a)(2)(B)(iii).

In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id*. § 1516a(b)(1). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. Prior Proceedings

With respect to the EBCP, Yama claimed in its Rule 56.2 motion that "Commerce should not have imposed countervailing duties upon Yama's exports for the EBCP" as the record evidence demonstrated that "neither Yama nor its customers used this program." *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1400 (quoting Mem. of P. & A. in

Supp. of Pl.'s 56.2 Mot. for J. on the Agency R. 24–25 (Oct. 28, 2020), ECF No. 29-2 ("Pl.'s Br.")). "In the alternative, Yama claims that the 10.54% subsidy rate that Commerce . . . attributed to the program was 'extremely adverse, punitive and not related to exports or this industry, or connected to the EBC.'" *Id*.

Concerning the provision of synthetic yarn and caustic soda for LTAR, Yama argued that Commerce improperly determined, through the use of facts otherwise available and adverse inferences, that "each of the private companies which supplied Yama with synthetic yarn and caustic soda is an 'authority,'" i.e., a government or public entity from which a countervailable subsidy may originate, as provided in 19 U.S.C. § 1677(5)(B). *Id*., 46 CIT at __, 611 F. Supp. 3d at 1404 (quoting Pl.'s Br. 9).

In *Yama I*, the court determined that "Commerce acted lawfully in deciding that the record before it, based on actual evidence and permissible adverse inferences, allowed Yama to benefit from 'programs' allowing it to obtain the inputs [synthetic yarn and caustic soda] for LTAR." *Id*., 46 CIT at __, 611 F. Supp. 3d at 1405 (citation omitted).

On the EBCP, *Yama I* held that "Commerce was within its authority in using an adverse inference that Yama benefitted from the EBCP" during the POR. *Id*., 46 CIT at __, 611 F. Supp. 3d at 1401. The court based its conclusion on the failure of the Chinese government to respond to a request from Commerce that was specific to the POR, i.e., calendar year 2017, and was worded as follows: "If you claim that no

customer of the respondent companies used buyer credits, please explain in detail the steps the government took to determine that no customer used Export Buyer's Credits." *Id*. (quoting *2017 Administrative Review of the Countervailing Duty Order on Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Countervailing Duty Questionnaire* at II-13 (Nov. 26, 2018), P.R. Doc. 4). Commerce used adverse inferences regarding the EBCP because the government of China (the "GOC"), making no meaningful attempt to comply with the Department's information request, did not provide any answers specific to the period of review and provided the same questionnaire response it had provided Commerce in the prior review. *Id*. (citing *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: GOC Response* (Feb. 19, 2019), P.R. Docs. 21, 23).

  The court concluded in *Yama I* that "Commerce must be afforded discretion to determine the scope of its inquiry in conducting reviews of countervailing duty orders, so long as it does so reasonably" and that "[h]ere, it was reasonable for Commerce to request information from the Chinese government to supplement and corroborate the information Yama provided to show that neither Yama nor its U.S. customers used the EBCP." *Id*. "But because the Chinese government made no effort to provide the requested information as it related specifically to the period of review, Commerce was within its authority in using an adverse inference that Yama benefitted from the EBCP during that period." *Id*. The POR-specific information Commerce requested from the

Chinese government "was missing from the record due to the failure of the Chinese government to make even a minimal effort to assist Commerce in confirming that Yama received no benefit from the EBCP during that year." *Id.*, 46 CIT at __, 611 F. Supp. 3d at 1402. Upon providing Commerce only its answer to the Department's questionnaire in the prior review, the government of China informed Commerce that it would not submit any further responses in the proceeding. *Id.*, 46 CIT at __, 611 F. Supp. 3d at 1400. The court recognized that the record contained information to support a finding that neither Yama nor its customers used the EBCP during the POR but reasoned that "Commerce was not required to consider that information determinative in the particular situation this case presents."[4] *Id.* "It was reasonable in that situation for Commerce to consider the POR-specific information it sought from the GOC—none of which it obtained—to be essential to its inquiry." *Id.*

Although concluding that Commerce permissibly could use an adverse inference that Yama benefitted from the EBCP, the court in *Yama I* remanded the Final Results to Commerce upon concluding that Commerce, in selecting the 10.54% subsidy rate for the EBCP as that adverse inference, had relied upon a finding unsupported by substantial evidence on the record. The finding at issue was that a Chinese government program

---

[4] Yama told the agency that it did not use the Export Buyers Credit Program during the period of review and was informed by its customers that they had not used the program either. Yama provided certifications of non-use from only some of its customers. *Yama Ribbons and Bows Co. v. United States*, 46 CIT __, 611 F. Supp. 3d 1394, 1401 (2022).

for preferential lending to the coated paper industry, for which Commerce had determined a subsidy rate of 10.54% in another countervailing duty proceeding, was available to the woven ribbons industry, of which Yama was a part. The court directed as follows:

> On remand, Commerce must reconsider, in the entirety, its use of the 10.54% rate as an adverse inference and explain why whatever rate it decides to use is appropriate under 19 U.S.C. § 1677e(b) and is consistent with the purpose of that statute, which, rather than to impose a rate that is "punitive," is to encourage interested parties to act to the best of their ability to comply with the agency's information requests. Commerce must explain, specifically, why it considers the rate it chooses to be appropriate for that purpose in the special case presented here, in which an unreasonably high rate could unduly prejudice Yama, as the "interested party" that was fully cooperative during the review.

*Id.*, 46 CIT at __, 611 F. Supp. 3d at 1403.

### C.  The Remand Redetermination

The issue remaining to be decided is whether Commerce acted lawfully in again assigning Yama, using facts otherwise available and an adverse inference, a countervailable subsidy rate of 10.54% for the EBCP. This requires the court to determine whether the assignment of this rate complies with the "adverse inference" provisions in the Tariff Act, 19 U.S.C. § 1677e(b), and, specifically, whether the findings Commerce made to support its conclusion under those provisions are supported by substantial evidence on the record of the seventh review.

In the Remand Redetermination, Commerce described a methodology for choosing an adverse inference rate that differed from the one it applied in the Final

Results.  For the Final Results, Commerce explained that "[c]onsistent with section 776(d) of the Act [19 U.S.C. § 1677e(d)] and our established practice, we select the highest calculated rate for the same or similar program as AFA" and described a "three-step" methodology for selecting that rate.  *Yama I*, 46 CIT at \_\_, 611 F. Supp. 3d at 1402—03 (citations and footnotes omitted).

As the first step in its methodology, Commerce stated that "[w]hen selecting rates in an administrative review, we first determine if there is an identical program from any segment of the proceeding and use the highest calculated rate for the identical program (excluding *de minimis* rates)."  *Id.* at 1402.  Where, as here, there was no such identical program, Commerce described as its second step that it would "determine if there is a similar/comparable program (based on the treatment of the benefit) within the same proceeding and apply the highest calculated rate for the similar/comparable program, excluding *de minimis* rates."  *Id.*  There having been no similar or comparable program "within the same proceeding," Commerce proceeded to its third step, stating that "we apply the highest calculated rate from any non-company specific program in any CVD case involving the same country, *but we do not use a rate from a program if the industry in the proceeding cannot use that program.*"  *Id.* at 1402—1403 (emphasis added).  Commerce explained that the 10.54% rate it chose was determined in "*Coated Paper from*

*China*" for the "Preferential Lending to the Coated Paper Industry program."[5]  *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1403 (citing *Decision Memorandum for Preliminary Results of 2017 Countervailing Duty Administrative Review: Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China* at 11 (Int'l Trade Admin. Aug. 5, 2019), P.R. Doc. 110).

Based on the Department's own description of its AFA rate selection methodology, Yama argued in its Rule 56.2 motion that Commerce failed to demonstrate that a loan program for the coated paper industry was available to the woven ribbons industry, and the court agreed with this argument.  *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1403.

In the Remand Redetermination, Commerce stated that it "reconsidered our selection of the 10.54 percent subsidy rate," *Remand Redetermination* at 3, and concluded again "that the 10.54 percent AFA rate is appropriate." *Id*. at 5.  Commerce explained that it had "incorrectly described the steps of Commerce's CVD AFA hierarchy" in the Final Results "as having three steps." *Id*. at 3 (footnote omitted).  "However,

---

[5] "*Coated Paper from China*" is a reference to a separate, prior countervailing duty proceeding.  *Yama Ribbons and Bows Co. v. United States*, 46 CIT __, 611 F. Supp. 3d 1394, 1403 (2022) (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 70,201 (Int'l Trade Admin. Nov. 17, 2010) (amending an earlier determination for ministerial errors, *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Final Countervailing Duty Determination*, 75 Fed. Reg. 59,212 (Int'l Trade Admin. Sept. 27, 2010)).

Commerce's CVD AFA hierarchy is more accurately described as having four steps."

*Id*. (footnote omitted).  The four-step "hierarchy" it described was as follows:

> Under the first step of Commerce's CVD AFA hierarchy for administrative reviews, Commerce applies the highest non-de minimis rate calculated for the identical program in any segment of the same proceeding.  If there is no identical program match within the same proceeding, or if the rate is de minimis, under step two of the hierarchy, Commerce applies the highest non-de minimis rate calculated for a similar program within any segment of the same proceeding.  *If there is no non-de minimis rate calculated for a similar program within the same proceeding, under step three of the hierarchy, Commerce applies the highest non-de minimis rate calculated for an identical or similar program in another CVD proceeding involving the same country.*  Finally, if there is no non-de minimis rate calculated for an identical or similar program in another CVD proceeding involving the same country, under step four, Commerce applies the highest calculated rate for any program from the same country that the industry subject to the review could have used.

*Id*. at 3—4 (emphasis supplied).  Commerce explained, further, that as "we had not previously calculated an above-*de minimis* rate for the Export Buyer's Credit program in this proceeding," it could not use step one of its methodology, and as "we found no similar/comparable program within this proceeding without a de minimis rate," it could not use step two.  *Id*. at 4.  Commerce instead relied on step three of its restated hierarchy to determine an AFA rate for the EBCP based on its findings in the prior CVD proceeding pertaining to a program for preferential lending to the Chinese coated paper industry.  *Id*.

In the Remand Redetermination, Commerce reasoned that "only the fourth step" of the Department's AFA methodology "requires that Commerce use a program

available to the industry in the proceeding." *Id*. at 5.  Because Commerce relied on the third step of the methodology it described in the Remand Redetermination, it "has not considered whether this program is available to the narrow woven ribbons with woven selvedge (narrow woven ribbons) industry in China." *Id*.  Thus, Commerce found it sufficient, for the purpose of determining an AFA rate for the EBCP, that a "preferential policy lending program in *Coated Paper from China* is similar to the Export Buyer's Credit program." *Id*. (citing *Final I&D Mem*. at 28).  Commerce, therefore, "continue[d] to apply the 10.54 percent subsidy rate as AFA for the Export Buyer's Credit Program" and "made no changes to Yama's overall subsidy rate presented in the *Final Results* (*i.e.*, 31.87 percent)." *Id*. at 9.

### D. Yama's Objections to the Remand Redetermination

Yama raises two objections to the Remand Redetermination.  It argues, first, that Commerce "has not supported with substantial evidence on *this* record its finding that the preferential policy lending program is similar to the EBCP." Yama's Comments 2.  Yama argues, second, that "Commerce applied essentially the same unsupported rationale as before to justify the use of the punitive AFA rate to Yama Ribbons, a fully cooperative respondent." *Id*. at 3.

### 1. Evidence Is Not on the Record to Support the Finding that the Preferential Lending Program Cited in *Coated Paper from China* is Similar to the EBCP

With respect to its first objection, Yama argues that "in the issues and decision memorandum for the Final Results, which is the only apparent support for its Remand

Results, Commerce does not cite to any evidence on the record of *this* proceeding demonstrating that the preferential policy lending program is similar to the EBCP," *id*. at 2—3, and that "[s]uch a failure ignores the Court's explicit instructions in the Remand Opinion." *Id*. at 3. Because the administrative record is insufficient to support a comparative analysis of the EBCP with the coated paper lending program Commerce cites, the court is persuaded by Yama's first objection.

The Tariff Act, in 19 U.S.C. § 1677e(d), provides that when Commerce "uses an inference that is adverse to the interests of a party under subsection (b)(1)(A) [19 U.S.C. § 1677e(b)(1)(A)] in selecting among the facts otherwise available," Commerce may "use a countervailable subsidy rate applied for the same *or similar program* in a countervailing duty proceeding involving the same country," *id*. § 1677e(d)(1)(A)(i) (emphasis added), or "if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use." *Id*. § 1677e(d)(1)(A)(ii). In the Remand Redetermination, Commerce invoked only the first of these two subsections, § 1677e(d)(1)(A)(i).

In both the Final Results and the Remand Redetermination, Commerce found that the preferential lending program identified in *Coated Paper from China* was similar to the EBCP. In both, the Department's finding of similarity was "based on the treatment of the benefit because the credits function as short-term or medium-term

loans." *Final I&D Mem.* at 28 (footnote omitted); *Remand Redetermination* at 5 (footnote omitted).

One problem in this case arises because the administrative record does not support a finding that there is a coated paper lending program involving government-conferred credits that "function as short-term or medium-term loans" and in that respect is similar to the EBCP. Yama does not contest that the record is sufficient to show that the EBCP is a government program to promote Chinese industries through the provision of loans with preferential interest rates. Pl.'s Br. 9—12 (detailing a "statement of facts relevant to the EBC Program," including that the EBCP is "an export promoting loan program administered by the Export-Import Bank of China"); *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1398—1400 (explaining that the EBCP is "an export-promoting loan program" that is "administered by the Export Import Bank of China"); *Final I&D Mem.* at 15 (describing the EBCP credits as "medium- and long-term loans" with "preferential, low interest rates") (citation omitted). Yama objects to the insufficiency of the record of the seventh review to establish facts about a coated paper lending program that would be needed to demonstrate similarity with the EBCP.

In referencing *Coated Paper from China* in both its Final Results, *Final I&D Mem.* at 28 n.133, and the Remand Redetermination, *Remand Redetermination* at 4 n.8, Commerce cited the final determination and countervailing duty order published in the Federal Register. *Certain Coated Paper Suitable for High-Quality Print Graphics Using*

*Sheet-Fed Presses From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 70,201 (Int'l Trade Admin. Nov. 17, 2010). Neither contains a meaningful description of a coated paper lending program.

A terse description of a coated paper lending program may be gleaned from the issues and decision memorandum Commerce incorporated by reference into the final determination for *Coated Paper from China*. *See Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China* at 11 (Int'l Trade Admin. Sept. 20, 2010). This public document, of which the court may take judicial notice, describes a coated paper program as involving "Policy Loans to Coated Paper Producers and Related Pulp Producers from State-Owned Commercial Banks and Government Policy Banks," *id*. at 11, but the evidentiary basis for that factual finding is not present on the administrative record of the review at issue in this litigation. Moreover, the issues and decision memorandum for *Coated Paper from China* does not indicate that the terms of the credits provided under a coated paper program necessarily were in the form of short-term or medium-term loans, as Commerce found. Even were the issues and decision memorandum to have so stated, the supporting record evidence is not available for the court's review.

A second problem in this case arises because, in the absence of any meaningful record evidence about a coated paper lending program, the court cannot presume that, had such evidence been placed on the record, it necessarily would *not* have included evidence of ways in which these two "programs" may have been *dis*similar.  Thus, any presumption of similarity so as to satisfy the criterion of 19 U.S.C. § 1677e(d)(1)(A)(i) would rest almost entirely on speculation.

Defendant does not offer a convincing response to Yama's argument, Yama's Comments 2—3, that record evidence is lacking to demonstrate the claimed similarity. Defendant argues that "the final results of *Coated Paper from China*" describe the preferential lending program as "a loan program from policy banks, as the title of the program also reasonably suggests."  Def.'s Resp. 8—9 (citing *Certain Coated Paper Suitable For High–Quality Print Graphics Using Sheet–Fed Presses from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination* 75 Fed. Reg. 10,774 (Int'l Trade Admin. Mar. 9, 2010).  The English-language title of the cited coated paper program is stated in the Federal Register documents as "Preferential Lending to the Coated Paper Industry program"; *see, e.g.*, *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 70,201 (Int'l Trade Admin. Nov. 17, 2010), but the court has no way

of reviewing even so much as a finding that this was the official title and also lacks essential information on how any such program operated.

In summary, the Department's finding of similarity between the cited coated paper program and the EBCP is not based on evidence present on the administrative record of the seventh review. Under the "substantial evidence" element of the standard of review, the court is, therefore, unable to conclude that the Department's ultimate determination of similarity would satisfy the requirement of 19 U.S.C. § 1677e(d)(1)(A)(i). *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (stating that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Commerce, therefore, must reconsider its decision to use the references to a coated paper program as the basis for an adverse inference subsidy rate.

### 2. The Court Defers Consideration of Yama's Second Objection

For its second objection, Yama argues that Commerce failed in its obligation to "justify the 10.54% AFA rate as appropriate in the 'special case presented here, in which an unreasonably high rate could unduly prejudice' Yama Ribbons." Yama's Comments 3 (quoting *Yama I*, 46 CIT at __, 611 F. Supp. 3d at 1403). Because Commerce must reconsider its choice to use the references to a coated paper program with the associated subsidy rate, the court defers consideration of Yama's second objection pending a response to the remand order the court is issuing.

### III. CONCLUSION

For the reasons set forth in the foregoing, the court remands the Remand Redetermination to Commerce for reconsideration in accordance with this Opinion and Order.

Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce shall submit a new determination upon remand (the "Second Remand Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that Commerce shall submit its Second Remand Redetermination within 60 days of the date of this Opinion and Order; it is further

**ORDERED** that any comments by plaintiff or defendant-intervenor on the Second Remand Redetermination must be filed with the court no later than 30 days after the filing of the Second Remand Redetermination; and it is further

**ORDERED** that defendant may file a response to comments within 15 days after the filing of the last comment submission on the Second Remand Redetermination.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: April 10, 2024
    New York, New York